# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58252-0-II |
| Respondent, | |
| v. | |
| TREVON McKEENEN ABSHIRE, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, P.J. — Trevon M. Abshire appeals his conviction and sentence for one count of third degree rape of a child. Abshire argues that (1) the trial court erred by not sua sponte excusing two actually biased jurors from Abshire's jury; (2) Abshire received ineffective assistance of counsel when defense counsel failed to challenge the seating of the actually biased jurors; and (3) the trial court violated Abshire's right to present a defense by excluding evidence that the victim had a history of sexual abuse. Abshire also challenges the imposition of the crime victim penalty assessment (CVPA) and DNA collection fee on his judgment and sentence. The State concedes that the CVPA and DNA collection fee should be stricken.

We hold that (1) Abshire has waived his juror bias argument; (2) Abshire did not receive ineffective assistance of counsel because neither challenged juror was actually biased; and (3) Abshire did not preserve his alternative argument for introducing prior abuse evidence to support his right to present a defense challenge, but even if he did, the trial court did not violate Abshire's

right to present a defense. We accept the State's concession regarding the CVPA and DNA collection fee. Accordingly, we affirm Abshire's conviction, reverse the CVPA and DNA collection fee, and remand to the trial court with instructions to strike the CVPA and DNA collection fee from Abshire's judgment and sentence.

FACTS

In January 2021, E.B.[1] disclosed to her father, Brian Abshire, that Abshire[2] raped her in 2019. Brian[3] subsequently reported the rape to law enforcement, and in August 2022, the State charged Abshire by amended information with third degree rape and third degree rape of a child. The case proceeded to a jury trial in August 2022.

A. FIRST TRIAL

Abshire's first trial ended in a mistrial. However, portions of E.B. and Brian's testimony from the first trial are relevant to the issues on appeal and are outlined below.

E.B. testified in the first trial that Abshire assaulted her by placing his penis inside her vagina. The State asked whether E.B. was "sure of that" and how she knew she was sure. 2 Verbatim Rep. of Proc. (VRP) (Aug. 30, 2022) at 170. E.B. responded: "Because I've had it happen to me before, and it was the same thing." 2 VRP (Aug. 30, 2022) at 170.

---

[1] We use initials to protect the victim's identity and privacy interests. *See* Gen. Ord. 2023-2 of Div. II, *Using Victim Initials* (Wash. Ct. App.), available at:
https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=2023-2&div=II.

[2] Abshire is Brian's nephew; however, Brian's parents adopted Abshire. Thus, Abshire is Brian's nephew by blood and brother by law.

[3] Because Trevon Abshire and Brian Abshire share the same last name, we refer to Brian by his first name to avoid confusion. We mean no disrespect.

Defense counsel questioned E.B. about her sexual history during cross-examination. Defense counsel asked E.B. whether "the times that [she] had sex before" were "also against [her] will," and E.B. confirmed they were. 2 VRP (Aug. 30, 2022) at 188. E.B. also clarified that the prior abuse happened "more than once or twice," "[b]y the same person," that person was not Abshire, and it happened when E.B. was around 8 years old, while she was living in Oregon. 2 VRP (Aug. 30, 2022) at 188. Finally, E.B. explained that the alleged perpetrator was never prosecuted because by the time she came forward, "the statute of limitations was already up." 2 VRP (Aug. 30, 2022) at 190.

During redirect, the State asked E.B. about earlier testimony that she self-harmed, asking if E.B. knew why she was self-harming. E.B. said her depression drove her to self-harm, and that what Abshire did to her caused her depression. Brian also testified that E.B. told him she was depressed because of what Abshire did to her.

The jury deadlocked on both counts, and the trial court declared a mistrial.

B.    SECOND TRIAL: JURY SELECTION AND MOTIONS IN LIMINE

The State retried Abshire on the same two counts in 2023.

1.    Jury Selection

Prior to trial, the potential jurors filled out a written questionnaire and participated in voir dire. Relevant to this appeal are the responses of jurors 12 and 22.

a.      Juror 12

In his juror questionnaire, juror 12 indicated he strongly agreed with the statement, "People accused of crimes should have to prove their innocence." Ex. at 21-22.[4] Juror 12 also indicated he strongly agreed with the statement, "Sex crimes should carry harsher penalties" and that he strongly disagreed with the statement, "It is better for society to let several guilty people go free than to convict one innocent person." Ex. at 21.  Finally, juror 12 indicated that he thought "the defendant should have a fair trial and should [be] charged accordingly to evidence" and that he could not think of anything that would prevent him from being completely fair to either the State or the defendant in a case charging child sex abuse.  Ex. at 22.

After reviewing the juror questionnaires, the parties questioned certain jurors privately and challenged several for cause.  Juror 12 was not questioned privately nor was he challenged for cause.

Next, the parties questioned the jurors as a group.  During Abshire's portion of voir dire, defense counsel had the following exchange with juror 12:

> [DEFENSE COUNSEL]: . . . You indicated on your questionnaire, sir, No. 12, that the accused must prove their innocence.
> [JUROR 12]: Yeah.  Well, I think that everybody's innocent until proven guilty, and they should have to prove their innocence if they're—if somebody makes a claim that they did something.
> [DEFENSE COUNSEL]: So in this case do you think that I have to prove that he's innocent?
> [JUROR 12]: No.  I think that there needs to be facts that—evidence that proves that he's not guilty.
> [DEFENSE COUNSEL]: That supports that he's not guilty?
> [JUROR 12]: Yes.

---

[4] The exhibits are unnumbered and unpaginated.  We use the PDF pagination in our citations to the exhibits document.

4

4 VRP (Mar. 14, 2023) at 602-03.

Shortly thereafter, a different prospective juror stated it would not be fair and impartial for them to serve on the jury because, in a close case, they would lean towards the State. Defense counsel then asked the venire, "How many other folks here honestly feel that way?" and while some jurors responded affirmatively, juror 12 did not. 4 VRP (Mar. 14, 2023) at 605.

Finally, the State asked the venire whether they thought they would make good jurors and why. Juror 12 responded: "Yes, I haven't had any of this stuff or anybody that's had any sort of abuse, so I don't really come into it with bias." 4 VRP (Mar. 14, 2023) at 627.

### b. Juror 22

In her juror questionnaire, juror 22 indicated she somewhat disagreed with the statement, "People accused of crimes should have to prove their innocence." Ex. at 30-31. She also indicated she did not have a problem with serving as a juror in a case charging child sex abuse, and that she could not think of anything that would prevent her from being completely fair to the State or Abshire.

Like juror 12, juror 22 was not questioned outside the presence of other prospective jurors nor was juror 22 challenged for cause by either party. During group questioning, defense counsel had the following exchange with juror 22:

> [DEFENSE COUNSEL]: Do you think that I have to prove my client is innocent?
> [JUROR 22]: That's a good question.
> [DEFENSE COUNSEL]: It is. It is. That's why I'm asking. That's why I get to stand up here and do this. Yippy. Tell me what you think. You've been around for a little bit of time. You're at least 39. So tell me what you think. Tell me what you think I ought to be doing when I represent this client here, Mr. Abshire. What do you think I ought to be doing?

> [JUROR 22]: I guess I think that you need to prove that he is innocent, or the other person has to prove that their—theirs is innocent. I guess you have to get the truth.
>
> [DEFENSE COUNSEL]: Get the truth. I have to get the truth. Okay. All right.

4 VRP (Mar. 13, 2023) at 603.

Like juror 12, juror 22 did not raise her number when defense counsel asked if anybody else felt it would not be fair and impartial for them to serve on the jury. Finally, when the State asked whether each prospective juror thought they would make a good juror and why, juror 22 responded: "Yes. . . . I have no prejudices and I have—am very objective. I listen and pay attention to what's going on." 4 VRP (Mar. 14, 2023) at 629 (PDF 77).

After the parties finished questioning the prospective jurors, each side exercised its peremptory challenges. Despite the opportunity to do so, neither party used a peremptory challenge on juror 12 or juror 22, and both parties exhausted their peremptory challenges. Jurors 12 and 22 sat on the jury.

### 2. Motions in Limine

#### a. Prior abuse evidence

Prior to trial, Abshire moved to admit "[e]vidence of [E.B.'s] claim of prior abuse" to demonstrate her "bias and prejudice," citing ER 609 and *State v. Markle*, 118 Wn.2d 424, 823 P.2d 1101 (1992) in support. Clerk's Papers (CP) at 49. The State moved to exclude the same evidence, arguing it "has no relevance to the current set of facts and the defense cannot establish that [E.B.] has made any past false allegations." CP at 60. The State also argued the evidence was not admissible as impeachment evidence because any past abuse that E.B. suffered from someone other than Abshire presented an issue collateral to the case.

6

During the hearing on the motions, Abshire clarified that the defense investigator found no record that the person E.B. claimed abused her existed and that Abshire planned to present the prior abuse testimony to show E.B.'s "bias and her prejudice because she lied about it." 3 VRP (Mar. 14, 2023) at 387. The State clarified that it would not ask E.B. about abuse by anyone other than Abshire. The trial court granted the State's motion to exclude the prior abuse evidence and denied Abshire's motion to admit the evidence because the evidence "doesn't appear to have any relevance in the case." 3 VRP (Mar. 13, 2023) at 390. The trial court also acknowledged that if a witness did "in some way bring that [prior abuse evidence] up," the trial court and parties would have to "deal with whether it's appropriate to challenge that assertion in rebuttal." 3 VRP (Mar. 13, 2023) at 390.

        b.     Self-harm scars

Abshire also moved the trial court to preclude the State from showing photos of E.B.'s self-harm scars to the jury, arguing the photographs were untimely, irrelevant, and prejudicial. At the hearing on the motion, Abshire explained that the photographs were irrelevant, arguing that "[E.B.] had alleged several times that she was the victim of abuse by two other people. So these scars are prejudicial to my client . . . and . . . have no value . . . because we don't know when these scars happened or if they even relate to my client's alleged acts on [E.B.]." 3 VRP (Mar. 13, 2023) at 400.

The State argued the self-harm photos were relevant because they corroborated E.B.'s testimony. The trial court excluded the photographs themselves, but ruled that E.B. could show the jury the scars when she testified: "Whether or not [the scars are] prejudicial . . . will depend on

7

whether the jury believes [E.B.] that they occurred in the time period they're talking about for the reasons she's talking about." 3 VPR (Mar. 13, 2023) at 405.

C. TRIAL

1. Opening Statements

During its opening statement, the State suggested the jury would hear evidence that as a result of the rape, E.B. was depressed, and that her depression manifested itself in self-harm. The State explained that the jury would see the scars on E.B.'s arms, and that the scars would corroborate her account.

During opening statement, Abshire told the jury that the case would come down to his and E.B.'s credibility, suggesting E.B. was "a very troubled teen who got in trouble wherever she went, who used this [accusation] as an excuse so that people would feel sorry for her and she wouldn't be in trouble anymore." 4 VRP (Mar. 14, 2023) at 678.

2. Trial Testimony

a. E.B.'s testimony

E.B. testified that in the summer of 2019, she moved from Idaho, where she had been living with her mother, to Washington to live with her father, Brian, and his family. Abshire was already staying in the garage of Brian's home when E.B. moved in. E.B. was 14 years old at the time.

E.B. also testified that Abshire raped her once, sometime between June and July 2019. E.B. explained that she was sitting on the couch in the living room when Abshire arrived home between 1:00 and 4:00 A.M. Abshire sat on the couch with E.B. and began rubbing her feet and legs. E.B. testified that she took her leg back by sitting up. E.B. planned on heading to bed, but before she could leave the room, "[Abshire] kind of grabbed my arm and forced me to go into the

garage." 4 VRP (Mar. 14, 2023) at 758. Once in the garage, Abshire put E.B. on the bed, removed her pants, covered her mouth, and raped her by "put[ting] his penis in my vagina." 4 VRP (Mar. 14, 2023) at 762. After Abshire ejaculated, he told E.B. to not tell anyone what happened. E.B. left the garage and went to bed. E.B. stated that she did not consent to the encounter and that she told Abshire to stop.

Shortly after the rape, E.B. moved back to Idaho in August 2019. E.B. disclosed the rape to her father in January 2021. E.B. testified that she called her father to report that she "was clean from cutting [herself] for two weeks." 5 VRP (Mar. 15, 2023) at 784. Brian asked her why she was harming herself, and she told him it was because Abshire raped her.

The State then asked E.B. to show the jury her self-harm scars. Abshire objected, arguing that showing the jury E.B.'s scars was "overly prejudicial," "invokes emotion in the jury, and vouches for the witness's credibility." 5 VRP (Mar. 15, 2023) at 800. The trial court overruled Abshire's objection, explaining that the evidence's corroborative value was "not outweighed by the prejudicial effect." 5 VRP (Mar. 15, 2023) at 800. E.B. stepped down from the witness stand and showed the jury the self-harm scars on her wrists.

During cross-examination, E.B. testified that she had been fighting with her mom and stepdad before she moved to Washington in 2019. Abshire focused the majority of his cross-examination on highlighting inconsistencies between E.B.'s pretrial statements and her trial testimony, such as when Abshire raped her, whether her dad and stepmom were home and awake when it occurred, whether Abshire raped her more than once, and whether she showered immediately after Abshire raped her or the next morning.

b.      Brian Abshire's testimony

Brian, E.B.'s father, testified that after E.B. disclosed the rape, he called Abshire and confronted him. Abshire initially denied raping E.B., so Brian told Abshire that either Abshire or E.B. was lying and asked again whether Abshire raped E.B. After a long pause, Abshire said, "'Yeah, I did it. I feel stupid.'" 5 VRP (Mar. 15, 2023) at 858. Brian repeated his question and Abshire responded "'Yeah. It happened. I just want to talk about it.'" 5 VRP (Mar. 15, 2023) at 858 (PDF 82). Brian asked Abshire twice more if he raped E.B., and Abshire answered affirmatively both times. At that point, Brian "exploded" at Abshire before hanging up on him. 5 VRP (Mar. 15, 2023) at 858.

After speaking with Abshire, Brian called the police to report the rape. Police arrived later that night to interview Brian and take photos of the home.

Abshire texted Brian the next morning to say "he didn't do anything, he doesn't know why he would say something like that." 5 VRP (Mar. 15, 2023) at 863. Brian responded that "an innocent man doesn't admit to rape four different times," and Abshire replied that he "'didn't admit to anything.'" 5 VRP (Mar. 15, 2023) at 863. Abshire also claimed he had been drunk the night before and did not remember saying he raped E.B.

c.      Law enforcement testimony

The State called two law enforcement witnesses who investigated the rape. First, the State called Officer Gregory Sulzinger. Officer Sulzinger testified that he was dispatched to Brian's home after Brian reported the rape. Officer Sulzinger collected information about Abshire and took photos of the interior of Brian's home. Officer Sulzinger did not collect any physical evidence because of the amount of time that had passed between the rape and the report. During cross-

examination, Abshire focused on Officer Sulzinger's failure to collect and test the sheets from Abshire's bed.

Second, the State called former Detective Kate Tierney. Tierney testified that she conducted a forensic interview with E.B. in February 2021. During cross-examination, Abshire focused on the techniques Tierney used during the forensic interview, suggesting that she introduced information into the interview and asked leading questions, contrary to established practice.

> d.      Abshire's testimony

Abshire testified. Abshire stated that he remembered E.B. moving into Brian's house around the summer of 2019, but he denied raping her.

Abshire was asked about the phone call he had with Brian in January 2021. According to Abshire, when Brian first confronted him, Abshire denied raping E.B. Abshire testified that it was only after Brian accused him "[q]uite a few times" that Abshire said, "'Fine. I'll take the blame.'" 5 VRP (Mar. 15, 2023) at 894. When defense counsel asked Abshire why he admitted to raping E.B. if it was not true, Abshire testified: "Honestly, I don't know. I just was trying to get the conversation to be over with and for it to be dropped, really. I don't, wasn't—I wasn't thinking." 5 VRP (Mar. 15, 2023) at 894. Abshire stated that he felt "badgered" into saying he raped E.B., he was drunk when he said it, and he only did so "[t]o please [Brian], because [Brian] asked [him] more than once." 5 VRP (Mar. 15, 2023) at 901, 909. Abshire also acknowledged texting Brian the next morning: "Pretty much telling him that I didn't do it, that I was not in the right mind when you called me that time." 5 VRP (Mar. 15, 2023) at 894.

3.      Closing Arguments and Verdict

During closing arguments, the State emphasized E.B.'s self-harm scars as evidence corroborating her account, arguing that the rape "manifested in [E.B.], in her body, in her mind, to the point where she was suffering from depression. And then it also affected her psychologically to the point where she was self-harming." 5 VRP (Mar. 15, 2023) at 932. The State also emphasized Abshire's four admissions to Brian that he raped E.B.

During closing argument, Abshire attacked law enforcement's investigation into E.B.'s allegations, arguing it was inadequate because Officer Sulzinger failed to collect any physical evidence and Tierney interviewed E.B. incorrectly. Abshire also highlighted E.B.'s inconsistent testimony and Brian's memory problems. Abshire cast himself as "an easy patsy for [E.B.] to blame, because he's not the kind of guy that's going to be able to defend himself well." 5 VRP (Mar. 15, 2023) at 951. Abshire argued that E.B. made up the allegations to "get . . . out of trouble" with her parents. 5 VRP (Mar. 15, 2023) at 951. Finally, Abshire argued that even if E.B. was harming herself, "it's not because of Mr. Abshire," asserting instead that E.B.'s self-harm stemmed from "all of the trouble that she's been in that's caused her to bounce from parent to parent. . . . There are a lot of reasons why kids cut themselves. But in this case, it is not Mr. Abshire." 5 VRP (Mar. 15, 2023) at 951.

The jury found Abshire guilty of rape of a child in the third degree, but could not reach a verdict on the third degree rape charge. The trial court declared a mistrial on the third degree rape charge.

D.    SENTENCING

The trial court sentenced Abshire to a standard range sentence of 13 months of confinement.  Also, the trial court found Abshire to be indigent because he "receives an annual income, after taxes, of one hundred twenty-five percent or less of the current federally established poverty level."  CP at 119.  The trial court imposed a $500 CVPA and $100 DNA collection fee.

Abshire appeals.

ANALYSIS

A.    ABSHIRE WAIVED HIS RIGHT TO CHALLENGE JURORS 12 AND 22

Abshire argues that jurors 12 and 22 were actually biased and that the trial court violated Abshire's constitutional right to a fair and impartial jury when the court failed to sua sponte excuse the two jurors.  The State responds that Abshire has waived his arguments because he failed to use available peremptory challenges to excuse juror 12 or juror 22.  Because Abshire had the opportunity to exercise peremptory challenges against both juror 12 and juror 22 but did not, we hold that he has waived his challenge to these jurors.

The State cites *State v. Talbott*, 200 Wn.2d 731, 521 P.3d 948 (2022), and its progeny to support its argument that Abshire waived his challenge to jurors 12 and 22.  In *Talbott*, our supreme court held that "a party who does not exhaust their peremptory challenges and accepts the jury panel cannot appeal the seating of a particular juror," but the court clarified that its holding was case-specific.  *Id.* at 733.  *See also In re Pers. Restraint of Perry*, 29 Wn. App. 2d 734, 748-49, 542 P.3d 168 (applying *Talbott*'s holding and concluding that the defendant waived any juror bias challenge "because he did not exercise an available peremptory challenge against Juror 8"), *review denied*, No. 102944-6 (Apr. 30, 2024).  Although *Talbott* is factually distinguishable—the

13

defendant in *Talbott* accepted the jury with unused peremptory challenges, while Abshire used all six of his available peremptory challenges—*Talbott* is instructive. 200 Wn.2d at 736.

Here, while Abshire ultimately exhausted his peremptory challenges, he had the opportunity to use peremptory challenges on jurors 12 and 22, but failed to do so. Thus, like the defendant in *Talbott*, Abshire waives any challenge to those jurors because he had the opportunity to exercise a peremptory challenge, but he failed to do so; instead, Abshire accepted jurors 12 and 22 without any objection. *See Perry*, 29 Wn. App. 2d at 748-49 (applying *Talbott*'s holding and concluding that the defendant waived any juror bias challenge because he did not exercise an available peremptory challenge against the juror).

*State v. Kovalenko*, 30 Wn. App. 2d 729, 735, 546 P.3d 514, *review denied*, No. 103024-0 (Dec. 5, 2024), also is instructive. In *Kovalenko*, the trial court denied Kovalenko's for cause challenge against an allegedly biased juror and Kovalenko exhausted his peremptory challenges against other jurors. *Id.* at 735, 737. The defendant appealed his convictions, arguing that one of the seated jurors "was biased and the trial court erred in allowing [that] juror . . . to sit on the jury panel." *Id.* at 735. On appeal, Kovalenko tried to distinguish his case from *Talbott* by arguing that unlike the defendant in *Talbott*, Kovalenko had exhausted his peremptory challenges. *Id.* at 737. Division One rejected this argument, explaining that while *Talbott* was distinguishable on that basis, "Kovalenko did not exhaust his peremptory challenges *before* he had a chance to strike" the allegedly biased juror. *Id.* at 738 (emphasis added). "Kovalenko's approach could improperly discourage counsel from curing potential jury-selection errors with peremptory challenges in order to obtain reversal on appeal." *Id.* Accordingly, the *Kovalenko* court held "that a party that unsuccessfully challenges a potential juror for cause and then does not use any of their peremptory

14

challenges to remove the challenged juror, and instead accepts the jury panel with the challenged juror, waives the right to have the for-cause challenge considered on appeal." *Id.*

*Kovalenko*'s reasoning is equally applicable to Abshire's case. Like in *Kovalenko*, Abshire "did not exhaust his peremptory challenges before he had a chance to strike" jurors 12 and 22. *Id.* at 738. If Abshire was worried that jurors 12 and 22 would prevent his case from being heard by a fair and impartial jury, he should have challenged both for cause or exercised a peremptory challenge against them. Abshire should not have, as his argument apparently suggests, expected the trial court to sua sponte strike the jurors for him, especially considering that a trial court should "'exercise caution before injecting itself into the jury[-]selection process,'" because doing so "risks disrupting counsel's jury-selection strategy." *Perry*, 29 Wn. App. 2d at 747 (alteration in original) (first quoting *State v. Lawler*, 194 Wn. App. 275, 284, 374 P.3d 278 (published in part), *review denied*, 186 Wn.2d 1020 (2016)). Accepting Abshire's argument would discourage counsel from bringing to the court's attention an issue with a potential juror or curing any potential jury-selection error with a peremptory challenge in order to secure a reversal on appeal.

Despite having the opportunity to do so, Abshire did not challenge jurors 12 and 22 by exercising a peremptory challenge against either juror. Instead, Abshire accepted both jurors without objection. Accordingly, Abshire has waived his juror bias challenge.[5]

---

[5] In his reply brief, Abshire argues that even if he had fully exhausted his peremptory challenges, this court should still determine whether the trial court erred by failing to sua sponte dismiss jurors 12 and 22, just as the court in *Kovalenko* did. Abshire asserts that "[a]fter holding that Kovalenko . . . waived his right to appeal the trial court's denial of his for-cause challenge, the court still went on to separately analyze the trial court's failure to remove the juror in question sua sponte for an abuse of discretion." Reply Br. of Appellant at 2. However, *Kovalenko* did not hold that a separate analysis is required even if the challenge is waived. And we are not bound by another division's decision. *In re Pers. Restraint of Arnold*, 190 Wn.2d 136, 154, 410 P.3d 1133 (2018).

B.      ABSHIRE DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL

Abshire argues that he received ineffective assistance of counsel when defense counsel "acquiesced to the seating of a biased juror without challenge." Br. of Appellant at 28. The State argues that because jurors 12 and 22 were not actually biased, Abshire's claim fails. We agree with the State.

1.      Legal Principles

Both the Sixth Amendment to the United States Constitution and article I, section 22 of our state constitution guarantee criminal defendants the right to effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011), *cert. denied*, 574 U.S. 860 (2014). To prevail on a claim of ineffective assistance of counsel, the defendant must show (1) deficient performance by counsel, and (2) that counsel's deficient performance prejudiced him. *Id.* at 32-33.

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Id.* at 33. This court applies "a strong presumption that counsel's performance was reasonable." *Lawler*, 194 Wn. App. at 289. "If defense counsel's conduct can be considered to be a legitimate trial strategy or tactic, counsel's performance is not deficient." *Id.*

As for the prejudice prong, the defendant must show that "'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Grier*, 171 Wn.2d at 34 (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). An ineffective assistance claim fails if either deficient performance or prejudice is not shown. *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

2.      No Ineffective Assistance of Counsel

Here, Abshire argues that defense counsel performed deficiently by "allowing Juror 12 and Juror 22 to serve without challenge despite their demonstrated bias." Br. of Appellant at 30. Thus, whether defense counsel performed deficiently turns on whether jurors 12 and 22 were actually biased.

"Actual bias" means "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2); *see also Lawler*, 194 Wn. App. at 281 ("[T]he trial court will excuse a juror for cause if the juror's views would preclude or substantially hinder the juror in the performance of his or her duties in accordance with the trial court's instructions and the jurors' oath."). An "unequivocal statement[] indicating bias, without a subsequent assurance of impartiality, can establish actual bias." *State v. Smith*, ___ Wn.3d ___, 555 P.3d 850, 855 (2024). The record must demonstrate a probability, rather than merely the possibility, of actual bias. *State v. Noltie*, 116 Wn.2d 831, 838-39, 809 P.2d 190 (1991).

a.      Juror 12

Abshire argues that juror 12 was actually biased because he "demonstrated . . . his inability to commit to the presumption of innocence." Br. of Appellant at 21. Juror 12's statements regarding the presumption of innocence were not unequivocal statements of bias; rather, they were a misunderstanding of the law.

Although the record clearly shows juror 12 misunderstood the burden of proof, juror 12 did affirmatively state, "I think that everybody's innocent until proven guilty." 4 VRP (Mar. 14,

2023) at 602. Similarly, while juror 12 stated that there needs to be "evidence that proves" Abshire is not guilty, juror 12 also answered, "No" when asked by defense counsel whether juror 12 thought that defense counsel had to prove Abshire is innocent. 4 VRP (Mar. 14, 2023) at 603. At best, juror 12's responses in voir dire showed a misunderstanding of the burden of proof. But juror 12 never stated, affirmatively or otherwise, that he was unable or unwilling to follow the law provided by the trial court. Juror 12 was explicitly instructed by the trial court on the presumption of innocence and the burden proof before deliberations, and we presume jurors follow the trial court's instructions. *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007).

Furthermore, the record fails to show juror 12 had any bias against Abshire. Defense counsel asked all of the prospective jurors whether anyone thought it would be unfair for them to serve on Abshire's jury because they were partial to the State, and while some jurors responded affirmatively, juror 12 did not respond. And juror 12's last statement to the parties and the court before being sworn in was one of impartiality: juror 12 said he would make a good juror because he had not "had any of this stuff or anybody that's had any sort of abuse, so I don't really come into it with bias." 4 VRP (Mar. 14, 2023) at 627.

Moreover, defense counsel's decision to not challenge juror 12 for cause or through the use of a peremptory challenge can be considered "a legitimate tactical or strategic decision." *See State v. Johnston*, 143 Wn. App. 1, 17, 177 P.3d 1127 (2007). In *Lawler*, we rejected appellant's ineffective assistance claim, which was premised on defense counsel's failure to challenge an allegedly biased juror, because

> [d]efense counsel may have thought juror 23 was a good juror despite his voir dire responses because of his background, other personal characteristics, mannerisms, or nonverbal communication. Or defense counsel may have preferred juror 23 over

the person who would have been seated on the jury if juror 23 was excused. Therefore, there are conceivable legitimate tactical reasons for defense counsel's decision to not challenge juror 23, and Lawler cannot overcome the presumption of effective performance.

194 Wn. App. at 290. Similarly, here, defense counsel may have preferred juror 12 to other jurors who may have been seated on the jury if juror 12 was challenged or defense counsel may have observed something about juror 12 that convinced defense counsel that juror 12 was not biased or was otherwise a good juror to have seated on the jury. Like in *Lawler*, these are all conceivable legitimate tactical reasons for defense counsel's decision to not challenge juror 12.

In sum, juror 12's inconsistent statements showed a misunderstanding of the burden of proof, but there is no evidence that juror 12 was unwilling to follow the law as instructed by the trial court, which included the correct burden of proof. Also, juror 12's statements during voir dire were not unequivocal statements of bias. Thus, Abshire has not shown a probability that juror 12 was actually biased. And because there were conceivable legitimate tactical reasons for defense counsel not to challenge juror 12, Abshire fails to overcome the presumption of effective performance.

b. Juror 22

Abshire argues that juror 22 was actually biased because she "demonstrated . . . her inability to understand her obligations under the law." Br. of Appellant at 25. However, juror 22's statements were markedly equivocal: she *thought* defense counsel had to prove Abshire's innocence and she *guessed* defense counsel had "to get the truth." 4 VRP (Mar. 13, 2023) at 603. Because juror 22's answers equivocal, they do not constitute statements of actual bias such that defense counsel should have challenged her for cause or by peremptory challenge. And, the same

conceivable legitimate tactical reasons that may have kept defense counsel from challenging juror 12 could also have reasonably kept defense counsel from challenging juror 22. Thus, defense counsel did not perform deficiently by not challenging juror 12 for cause or by peremptory challenge.

Because Abshire fails to establish that jurors 12 or 22 were actually biased, he "cannot establish the absence of any conceivable legitimate tactic for not excusing" the jurors. *Lawler*, 194 Wn. App. at 290. Thus, Abshire has failed to overcome the presumption that defense counsel performed reasonably, and his ineffective assistance claim fails.

C.      RIGHT TO PRESENT A DEFENSE

Abshire argues that "[t]he trial court unconstitutionally restricted Abshire's right to present a defense when it precluded him from presenting an alternative explanation for E.B.'s self-harm or from questioning E.B. about her prior testimony." Br. of Appellant at 31. Abshire contends that the prior abuse evidence was relevant because if E.B. was telling the truth about the prior abuse, "the former abuse was relevant to rebut the State's theory that E.B.'s self-imposed scars corroborated her claim . . . that Abshire raped her." Br. of Appellant at 34. And if E.B. was lying, the evidence was still relevant because it undermined E.B.'s credibility by demonstrating she lied during Abshire's first trial.

1.      Legal Principles

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington constitution guarantee criminal defendants the right to present evidence in their defense. *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010).

Appellate courts review alleged violations of the right to present a defense using a two-step framework. In the first step of the analysis, we "review the trial court's individual evidentiary rulings for an abuse of discretion." *State v. Arndt*, 194 Wn.2d 784, 797, 453 P.3d 696 (2019), *cert. denied*, 142 S. Ct. 726 (2021). "'A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons.'" *Id.* at 799 (quoting *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007)). If the trial court abused its discretion and the error prejudiced the defendant, the analysis ends at the first step. *State v. Jennings*, 199 Wn.2d 53, 59, 502 P.3d 1255 (2022). However, if the trial court did not abuse its discretion or if there was error but the error was harmless, we move on to the second step of the analysis and "consider de novo the constitutional question of whether [the trial court's] rulings deprived [the defendant] of [their] Sixth Amendment right to present a defense." *Id.*; *Arndt*, 194 Wn.2d at 797-98.

Under the second step of the analysis, we balance the defendant's need for the evidence against the State's interest in excluding the evidence. *Arndt*, 194 Wn.2d at 812. "In some instances regarding evidence of high probative value, 'it appears no state interest can be compelling enough to preclude its introduction.'" *Id.* at 812 (quoting *State v. Hudlow*, 99 Wn.2d 1, 16, 659 P.2d 514 (1983)).

2.      Abshire Did Not Preserve His Alternative Explanation Argument

As a threshold matter, the State argues that Abshire did not offer E.B.'s prior testimony as an alternative explanation for her self-harm; rather, Abshire only offered the evidence to show E.B.'s bias and prejudice. Therefore, the State contends, "this Court should only analyze the theory of relevance advocated by Abshire's trial counsel." Br. of Resp't at 42. We agree.

21

Pursuant to RAP 2.5(a), we "may refuse to review any claim of error which was not raised in the trial court." For example, we will not reverse the trial court's evidentiary ruling where the trial court rejected the defendant's specific theory of admissibility below and then, on appeal, the defendant argues admissibility based on an evidentiary rule not raised at trial. *State v. Ferguson*, 100 Wn.2d 131, 138, 667 P.2d 68 (1983), *abrogated on other grounds by State v. Crossguns*, 199 Wn.2d 282, 294, 505 P.3d 529 (2022); *see also State v. Lazcano*, 188 Wn. App. 338, 355, 354 P.3d 233 (2015) ("A party may not generally raise a new argument on appeal that the party did not present to the trial court. A party must inform the court of the rules of law it wishes the court to apply and afford the trial court an opportunity to correct any error." (citation omitted)), *review denied*, 185 Wn.2d 1008 (2016); *Kirkman*, 159 Wn.2d at 926 ("A party may assign evidentiary error on appeal only on a specific ground made at trial. This objection gives a trial court the opportunity to prevent or cure error" by "strik[ing] testimony or provid[ing] a curative instruction to the jury." (citation omitted)); *and State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988) (Pursuant to RAP 2.5(a), we "will not sanction a party's failure to point out at trial an error which the trial court, if given the opportunity, might have been able to correct to avoid an appeal and a consequent new trial.").

Here, Abshire did not offer the prior abuse evidence as an alternative explanation for why E.B. was self-harming. Instead, Abshire offered the prior abuse evidence to "show [E.B.'s] bias and her prejudice because she *lied* about" the prior abuse. 3 VRP (Mar. 13, 2023) at 387 (emphasis added).

It is true, as Abshire argues on appeal, that in *State v. Carver*, we explained that "evidence of prior sexual abuse" of the victims was relevant because it rebutted "the inference [the victims]

would not know about such sexual acts unless they had experienced them with [the] defendant." 37 Wn. App. 122, 124, 678 P.2d 842, *review denied*, 101 Wn.2d 1019 (1984). However, in *Carver*, the defendant offered the prior abuse evidence for precisely that reason, whereas here, Abshire did not make an alternative explanation argument to the trial court. Because Abshire did not "inform the court of the rules of law it wishe[d] the court to apply," nor did he "afford the trial court an opportunity to correct" the alleged error he argues on appeal, Abshire did not preserve his alternative explanation argument. *Lazcano*, 188 Wn. App. at 355.

However, we note that when Abshire moved to exclude photos of E.B.'s self-harm scars, he did argue that the photos were prejudicial in part because "we don't know when these scars happened or if they even relate to my client's alleged acts on her." 3 VRP (Mar. 13, 2023) at 400. While this statement mirrors the alternative explanation argument Abshire makes on appeal, Abshire made the statement in the context of a separate motion in limine than the one he appealed from. But even if Abshire's statement made in the context of a separate motion in limine than the one appealed is sufficient to preserve the issue, Abshire's challenge fails.

3.      No Violation of the Right to Present a Defense

Abshire argues that if E.B. testified truthfully about the prior abuse, that evidence was relevant to provide an alternative explanation for why E.B. self-harmed. We review the issue de novo and hold that Abshire's constitutional right to present a defense was not violated.

a.      The alternative explanation evidence was relevant

Relevant evidence is admissible, but irrelevant evidence is not. ER 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of

consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401.

Abshire argues that the prior abuse evidence was "relevant to rebut the State's theory that E.B.'s self-imposed scars corroborated her claim in Abshire's second trial that Abshire raped her and that E.B. had no reason other than being raped by Abshire to harm herself." Br. of Appellant at 34. We agree.

*Carver* provides an analogous situation. There, we explained that "evidence of prior sexual abuse" of the victim was relevant because it rebutted "the inference [the victims] would not know about such sexual acts unless they had experienced them with [the] defendant." *Carver*, 37 Wn. App. at 124. Excluding the evidence "unfairly curtailed [the] defendant's ability to present a logical explanation for the victims' testimony." *Id.* at 125. Similarly, here, evidence that E.B. had been sexually abused by someone other than Abshire before she met Abshire was relevant to rebut "the inference" that E.B. only cut herself because Abshire raped her. *Id.* at 124. In other words, providing the jury with an alternative explanation for E.B.'s self-harm made a fact "of consequence"—whether Abshire raped E.B.—less probable by contradicting one of the State's corroboration arguments. ER 401. Thus, the prior sexual abuse evidence was relevant, and the trial court abused its discretion by excluding it as irrelevant.

b.      No prejudice in excluding the alternative explanation evidence

Evidentiary errors are reviewed under the nonconstitutional harmless error standard. *State v. Gower*, 179 Wn.2d 851, 854, 321 P.3d 1178 (2014). Under that standard, we will not reverse the trial court unless the defendant shows that, absent the error, there is a reasonable probability that "'the outcome of the trial would have been materially affected.'" *State v. Gresham*, 173 Wn.2d

405, 433, 269 P.3d 207 (2012) (internal quotation marks omitted) (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

The trial court's error here was harmless. First, the admission of the prior abuse evidence as an alternative explanation for E.B.'s self-harm scars would not have precluded E.B. from testifying, or the State from arguing, that Abshire's sexual abuse of E.B. was the motivator for E.B.'s self-harm. The record suggests that E.B. would have testified as much, because during Abshire's first trial, *after* E.B. mentioned the prior abuse, she still attributed her self-harm to "this incident with [Abshire]." 2 VRP (Aug. 30, 2022) at 209. Not only that, but Brian also testified during Abshire's first trial that when E.B. told him about her depression, she attributed it to Abshire raping her. Second, even with the alternative explanation to undercut the State's use of E.B.'s self-harm scars as physical corroboration of the rape, the jury would still have heard the strongest evidence against Abshire: Brian's testimony that Abshire admitted four times over the phone that he raped E.B.

Abshire cites *State v. Kilgore*, 107 Wn. App. 160, 26 P.3d 308 (2001), *aff'd*, 147 Wn.2d 288 (2002), to argue that because of the centrality of E.B.'s credibility to the case and Abshire's "at most vague" confession, any error was not harmless. Br. of Appellant at 38 (PDF 47-48). *Kilgore* is distinguishable. In *Kilgore*, the defendant "admitted to [a witness] and his wife that maybe he had done something," whereas Brian testified that Abshire explicitly admitted to raping E.B. four times. 107 Wn. App. at 179. Thus, while E.B.'s credibility may have been central to the case, Abshire's admissions were not vague. The trial court's evidentiary error was harmless.

c.      Constitutional right

A defendant's right to present a defense is not absolute. *Arndt*, 194 Wn.2d at 812. Because a defendant does not have a constitutional right to present irrelevant evidence, the evidence presented must be at least minimally relevant to implicate the right to present a defense. *Jones*, 168 Wn.2d at 720. As noted above, the prior abuse evidence was at least minimally relevant to rebut the State's theory regarding E.B.'s self-harm scars.

However, there is "a clear distinction between evidence" that is relevant "and evidence that, if excluded, would deprive the defendant of the ability to testify to their versions of the incident." *Jennings*, 199 Wn.2d at 66. Here, the trial court's exclusion of the prior abuse evidence did not preclude Abshire from presenting his defense of general denial. Furthermore, Abshire was still able to provide an alternative explanation for E.B.'s self-harm: during closing arguments, Abshire argued that even if E.B. was self-harming, it was "not because of Mr. Abshire," but because of "all of the trouble that she's been in that's caused her to bounce from parent to parent." 5 VRP (Mar. 15, 2023) at 951.

Not only was Abshire still able to present his theory of the case and an alternative explanation for E.B.'s self-harm, but the State had a strong interest in excluding the evidence. As the State argues in its brief, prior abuse evidence "may distract and inflame jurors, especially when the prior" abuse evidence "bears no direct relationship to the issues in the case." Br. of Resp't at 53. We agree. Allowing Abshire to present the alternative explanation would have risked confusing the issues. The State thus had a strong interest in keeping the jury focused on E.B.'s allegations against Abshire rather than on abuse by an undisclosed individual. Because the State had an interest in excluding the prior abuse evidence and Abshire still had "an opportunity to

26

defend against the State's accusations," the trial court did not violate Abshire's constitutional right to present a defense by excluding the prior abuse evidence. *Jennings*, 199 Wn.2d at 66.

4.      Constitutional Harmless Error

The State argues that "[e]ven if the trial court erred in excluding" the prior abuse "evidence, this Court should uphold the conviction under the harmless error doctrine." Br. of Resp't at 64. We agree.

"Violations of the right[] to present a defense . . . are subject to constitutional harmless error review." *State v. Orn*, 197 Wn.2d 343, 359, 482 P.3d 913 (2021). To demonstrate harmless error, the State must show, "'beyond a reasonable doubt that the jury would have reached the same verdict without the error.'" *Id.* (quoting *State v. Romero-Ochoa*, 193 Wn.2d 341, 347, 440 P.3d 994 (2019), *cert. denied*, 141 S. Ct. 398 (2020)).

Here, the strongest evidence against Abshire was Brian's testimony that Abshire admitted four times over the phone that he raped E.B. Even with an alternative explanation for E.B.'s self-harm, and even had Abshire been allowed to impeach E.B. with the prior abuse evidence, the jury would still have heard testimony that the defendant himself admitted to the rape multiple times. This is sufficient to show beyond a reasonable doubt that even had Abshire been allowed to present the prior abuse evidence, the jury would still have reached the same verdict. Thus, any error was harmless.

D.      LFOs

Abshire argues, and the State concedes, that the CVPA and DNA collection fee should be stricken from Abshire's judgment and sentence. We accept the State's concession.

27

Effective July 1, 2023, RCW 7.68.035(4) prohibits courts from imposing the CVPA on indigent defendants. *See State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048, *pet. for review*, No. 102378-2 (Sep. 13, 2023). A defendant is indigent if they "[r]eceiv[e] an annual income, after taxes, of one hundred twenty-five percent or less of the current federally established poverty level." RCW 10.101.010(3)(c). Although the amendment to RCW 7.68.035(4) took effect after Abshire's sentencing, it applies to cases pending on appeal. *Ellis*, 27 Wn. App. 2d at 16.

Here, the trial court determined that Abshire was indigent because he "receives an annual income, after taxes, of one hundred twenty-five percent or less of the current federally established poverty level." CP at 119. Thus, the CVPA is no longer authorized for Abshire.

Also, effective July 1, 2023, the DNA collection fee is no longer statutorily authorized. RCW 43.43.7541; LAWS OF 2023, ch. 449, § 4. Because Abshire's case is on appeal, the amendments to RCW 43.43.7541 apply. *Ellis*, 27 Wn. App. 2d at 17. Therefore, imposition of the DNA collection fee is no longer authorized.

Because neither challenged fee is currently statutorily authorized, and Abshire is indigent, we remand to the trial court with instructions to strike the CVPA and DNA collection fee from Abshire's judgment and sentence.

CONCLUSION

We affirm Abshire's conviction, reverse the CVPA and DNA collection fee, and remand to the trial court with instructions to strike the CVPA and DNA collection fee from Abshire's judgment and sentence.

No. 58252-0-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, P.J.

We concur:

Price, J.

Che, J.